# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>CAPREF LLOYD CENTER EAST, LLC[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 23-11942 (TBD) |

## DECLARATION OF TODD MINNIS IN SUPPORT OF
## CHAPTER 11 PETITION AND CERTAIN FIRST DAY MOTIONS

I, Todd Minnis, declare under penalty of perjury the following information is true and correct to the best of my current knowledge, information, and belief:

1. I am the President of the above-captioned debtor and debtor in possession (the "Debtor") in this chapter 11 case (the "Case"). I also serve as the President of Cypress REIT, LLC. Cypress REIT, LLC ("Cypress REIT" or "Member/Manager") is the sole manager and member of the Debtor.

2. I have more than 25 years of experience in the commercial real estate business.

3. I am generally familiar with the Debtor's history, assets, business and financial affairs, and books and records, as well as the Debtor's ongoing restructuring efforts.

4. On December 4, 2023 (the "Petition Date"), the Debtor filed a voluntary chapter 11 petition with the United States Bankruptcy Court for the District of Delaware. To minimize the effects of filing for Chapter 11 protection while at the same time preserving value for the benefit of its stakeholders, and concurrently with the filing of this declaration (the "First Day Declaration"), I understand the Debtor has requested various forms of "first day" relief via various first day filings (collectively, "First Day Motions").

---

[1] The Debtor in this case, along with the last four digits of its federal tax identification number, is CAPREF Lloyd Center East, LLC (1920). The location of its service address in this chapter 11 case is 4514 Travis Street, Suite 208, Dallas, TX 75205.

5.     The First Day Motions are intended to enable the Debtor to operate and navigate effectively and efficiently within this Case, as well as to avoid certain adverse consequences that might otherwise result from the commencement thereof.  Among other things, the First Day Motions seek relief aimed at complying with Bankruptcy Code requirements, maintaining the confidence of stakeholders, and preserving the value of the Debtor's assets and bankruptcy estate, all with the ultimate goal of maximizing value for the benefit of all creditors and stakeholders.

6.     I am over the age of 18 and I am authorized to submit this First Day Declaration on behalf of the Debtor.  Except as otherwise indicated, all facts and statements set forth herein are based on personal knowledge and experience, review of relevant documents and information, and/or discussions with Debtor professionals.  If called as a witness, I could and would competently testify to the facts set forth in this First Day Declaration.

7.     This First Day Declaration is divided into four primary parts. Part I summarizes the Debtor's history and assets, including the Property.  Part II describes the Debtor's corporate and capital structure and provides background information regarding (a) certain primary creditors and their respective claims, (b) prepetition state court receivership proceedings involving the Debtor and its Property and, (c) the Southern District of Texas bankruptcy cases filed in 2022 by the Regal Cinema Debtors, which cases involved (in small part) a Property-related contract between the Debtor and one of those Regal Cinema Debtors.  Part III sets forth the Debtor's goals and plans for this Case.  Part IV affirms and incorporates the facts that support the interim and final relief requested by the First Day Motions.

**Part I**
**The Debtor's History and Assets, Including the Property**

8. The Debtor is a Delaware limited liability company formed on August 4, 2016. Its principal place of business is in Dallas, Texas, with a current address of 4514 Travis Street, Suite 208, Dallas, TX 75205.

9. The Debtor is a company formed specifically to facilitate the purchase, financing, and development of that certain commercial property consisting of land, buildings, and other improvements located thereon, with a listed address of 1260 NE Lloyd Center, Portland, OR 97232 (hereafter, the "Property"). The Property was acquired in August 2016 and is located in Multnomah County.

10. The Property is part of a larger mall property currently owned by third parties.[2] The mall property sometimes is referred to as the Lloyd Center.

11. Sears, Roebuck & Co. formerly owned the Property, with a Sears retail store location operated thereon. The Property currently sits vacant and unoccupied, with no current tenants.

12. The Lloyd Center mall itself has fallen on hard times in recent years. However, it remains a large property holding, subject to potential redevelopment efforts.

13. The Debtor generates no current income from the Property.

14. The Property is the Debtor's primary asset.

---

[2] Upon information and belief, the owner of the remaining parcels of the Lloyd Center is KKR Real Estate and Finance Trust and/or its respective affiliates.

## Part II
## Corporate and Capital Structure of the Debtor; Key Creditors/Debts

  **A.**  **Corporate Structure**

  15. The Debtor is wholly owned by Member/Manager. Member/Manager, in turn, is wholly owned by Cypress Acquisition Partners Retail Fund, L.P.

  **B.**  **Prepetition Capital Structure and Key Creditors/Debts**

  16. To help pay for and finance its August 2016 purchase and the proposed development of the Property, on or about March 21, 2017, the Debtor, as borrower, and Keystone Real Estate Lending Fund, L.P., as lender ("Keystone"), entered into that certain Term Loan Agreement (the "Loan Agreement"). Pursuant to the Loan Agreement, Keystone extended a loan to the Debtor in the original principal amount of $7,526,520.00 (the "Keystone Loan"), with such indebtedness secured by, among other things, the Property.

  17. The Keystone Loan is evidenced by, among other things, that certain Secured Promissory Note dated March 21, 2017 (as amended or otherwise modified, the "Note"). The Note was in the original principal amount of the Keystone Loan.[3]

  18. The Keystone Loan is secured by, among other things, a Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing recorded on March 24, 2017, in the Official Records of Multnomah County, Oregon, as Instrument No. 2017-035671 (the "2017 Deed of Trust").[4] The Deed of Trust encumbers the Property.

---

[3] The Loan Agreement and Note were subsequently modified by that certain Loan and Note Modification Agreement dated February 4, 2019; that certain Second Loan and Note Modification Agreement dated February 28, 2020; and that certain Third Loan and Note Modification Agreement, dated May 21, 2021 (together, the "Loan Modifications"). Pursuant to the terms of the Loan Modifications, the maturity dates of the Keystone Loan and Note were extended to June 1, 2022.

[4] The 2017 Deed of Trust was thereafter amended by that certain First Amendment to Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing, dated February 4, 2019 (the "First Amendment to Deed of Trust") and further amended by that certain Second Amendment to Deed of Trust, Assignment of Rents, Security

19. The payment and performance of the Debtor's obligations to Keystone were guaranteed by Cypress Acquisition Partners Retail Fund, L.P.[5] pursuant to that certain Limited Recourse Guaranty, dated as of March 21, 2017 (the "Guaranty" and along with the Loan Agreement, Note, Deed of Trust, Loan Modifications and all other documents executed in connection with or evidencing the Keystone Loan, as amended or modified by the parties, the "Loan Documents").

20. Pursuant to the Loan Agreement, the Debtor was required to repay the Keystone Loan by making certain monthly payments to Keystone, with all unpaid principal, interest and other amounts owed to Keystone under the Loan Agreement to be paid in full by the original maturity date of March 21, 2018, as modified and extended by the Loan Modifications.

21. The Debtor currently is in default under the Loan Documents by, among other things, failing to make required payments when due.

22. On February 10, 2022, Keystone sent the Debtor a notice of default and demand for payment. In addition, Keystone exercised its rights pursuant to the Loan Documents to accelerate the entire principal amount, accrued and unpaid interest, attorneys' fees and costs, and other indebtedness due under the Loan Documents. Keystone declared all amounts to be immediately due and payable.

23. As of November 24, 2023, I understand the amount due under the Loan Documents was at least $10,699,166.86, plus interest, default interest, late fees, attorneys' fees

---

Agreement and Fixture Filing, dated May 21, 2021 (the "Second Amendment to Deed of Trust" and along with the 2017 Deed of Trust and First Amendment to Deed of Trust, the "Deed of Trust").

[5] Cypress Acquisition Partners Retail Fund, L.P. ("Guarantor") is a Debtor affiliate.

and costs.[6]  Interest on amounts owed to Keystone under the Loan Documents has continued to accrue at the default rate of 13% per annum.

24.     The Debtor also is delinquent on unpaid real property taxes, plus penalties and interest, with respect to the Property.  These amounts are due and owing to Multnomah County.[7]  Real property taxes, at least in large part, have not been paid since the 2020 tax year.  Upon information and belief, taxes and penalties continue to accrue; the current amount owed in unpaid real estate taxes, plus penalties and interest, is asserted to be at least $584,424.14.

25.     The Debtor currently has no funds to pay allowed claims for Keystone, Multnomah County, or any of its other creditors.  As of the Petition Date, approximately $21,087.28 in cash was held in the bank account maintained in the Receivership Proceedings.

26.     In addition to Keystone and Multnomah County, Eastgate Theatre, Inc. ("Eastgate", an affiliate of Regal Cinemas) may assert a large claim in this Case based upon the terms and provisions of an agreement titled "Lease".[8]  The Debtor and Eastgate entered into the Lease dated as of November 1, 2017.

27.     As Eastgate explained in multiple prior filings made in the Receivership Proceedings (defined and discussed below), it viewed entry into the Lease and SNDA (as referenced below) as critical pieces and components of the settlement of prior state court

---

[6] In recent years, I understand Keystone has made loan overadvances to the Debtor (and then to the Receiver) to pay for items such as insurance, utilities, security, repairs and maintenance, and the like.

[7] I understand Multnomah County may assert a first priority lien on the Property for all amounts due with respect to unpaid real property taxes.  Unpaid real property taxes are assessed statutory interest.

[8] Also on the Petition Date, the Debtor intends to file a motion to reject the Lease (the "Lease Rejection Motion").  Additional facts concerning the Lease are set forth in the Lease Rejection Motion.

litigation commenced by Eastgate in 2015.[9] Eastgate had commenced that litigation against certain parties, including an affiliate of the Debtor.

28. On November 1, 2017, among other things, (i) the parties to the 2015 litigation executed a Settlement Agreement and Release; (ii) the Debtor and Eastgate executed the Lease; and (iii) Keystone, Eastgate, and the Debtor executed that certain Non-Disturbance, Attornment and Subordination Agreement ("SNDA").

29. As of November 1, 2017, no movie theatre was located at or on the Property. Pursuant to the Lease, the Debtor agreed to construct a large movie theatre on the Property and lease it to Eastgate.

30. Once construction was complete and the Debtor delivered a completed movie theatre to Eastgate, Eastgate as tenant was to occupy and operate the new movie theatre in exchange for paying the Debtor base rent, other sums, and other obligations. Eastgate's obligations to pay rent and other amounts under the Lease did not begin until delivery of a new theatre.

31. The "target date" for substantial completion of the new theatre construction was March 1, 2019. Moreover, the Debtor was required to construct the theatre by an outside date of October 1, 2020. It did not do so. In fact, movie theatre construction never even began.

32. If the theatre was not constructed by the outside date (October 1, 2020), and if Eastgate then exercised its right to terminate the Lease, the Lease provided Eastgate would be due $10 million as "liquidated damages". Upon information and belief, Eastgate has not served a written notice of termination of the Lease.

---

[9] Eastgate had filed that litigation with respect to an existing movie theatre it operates in a different portion of the Lloyd Center (the portion referred to as the South Superblock).

33. Upon information and belief, Eastgate has never occupied or operated in business from the Property and has not paid the Debtor (or Receiver) any rent or other amounts addressed in the terms of the Lease.

    C.    **Oregon State Court Receivership and the Chapter 11 Cases filed by the Regal Cinema Debtors**

34. On March 7, 2022, Keystone filed a complaint in the Circuit Court of the State of Oregon in Multnomah County (the "State Court"), which action remains pending under Case No. 22-cv-07952 (the "Receivership Proceedings"). Keystone asserted claims against the Debtor and Guarantor for breach of the Loan Agreement and Guaranty, respectively. It also sought appointment of a receiver.

35. On April 15, 2022, the State Court entered an order (the "Receivership Order"), among other things, appointing CFO Solutions LLC, d/b/a Amplêo, as Receiver for the Loan Collateral (as defined in the Receivership Order). A copy of the Receivership Order is attached hereto as **Exhibit 1**.

36. I understand the State Court then permitted Eastgate to intervene in the Receivership Proceedings.

37. I further understand that in the Receivership Proceedings, the Receiver filed a Notice of Intent to Reject the Lease which Eastgate opposed.

38. The matter was scheduled for a hearing in the State Court on September 8, 2022. However, on September 7, 2022, Eastgate and over 100 affiliate debtors filed their Chapter 11 Cases in the Bankruptcy Court for the Southern District of Texas. S*ee* Main Case No. 22-90168 (Bankr. S.D. Tex.) (MI) (Cineworld Group plc was the lead debtor; all of those debtors collectively will be referred to herein as the "Regal Cinema Debtors").

39. I understand the Receiver then sought relief in those bankruptcy cases. He filed a motion to compel rejection of the Lease (the "Receiver's Motion"). In that motion, I understand the Receiver indicated that he had been unsuccessful in getting anyone on the Regal Cinema Debtors side to engage in discussions regarding the Lease and its ultimate disposition. To the best of my knowledge, that remains the case today.

40. The Regal Cinema Debtors responded in opposition to the Receiver's Motion. I understand the Texas Bankruptcy Court thereafter denied the Receiver's Motion.

41. I understand the Regal Cinema Debtors' joint plan of reorganization was confirmed by entry of an order on June 28, 2023. I further understand the confirmed Plan became effective on July 31, 2023.

42. Upon information and belief, the Lease was listed as an assumed unexpired lease under the Regal Cinema Debtors' confirmed Plan and then purportedly assigned to a newly formed entity referred to as New RCI Holdings, Inc. ("New RCI").[10]

43. I understand the Receiver has stated it has been informed by potential interested purchasers that the Property essentially is unmarketable if the Lease remains in place.

44. In the Debtor's view, no progress has been made for over 18 months with respect to a marketing and sale process for the ultimate disposition of the Property. Following a rejection of the Lease, and subject to Court approval, the Debtor intends to promptly market and sell the Property in this Case to the bidder submitting the highest and/or best offer for the Property.

---

[10] References to Eastgate herein will be deemed to include and encompass the original contract counterparty (Eastgate Theatre, Inc.) and New RCI, as necessary and appropriate.

## Part III
## The Bankruptcy Case; Debtor's Plan to Reject the Lease,
## Sell the Property Free and Clear, and File a Chapter 11 Plan and Disclosure Statement

45. The Debtor's chapter 11 petition was filed on the Petition Date.

46. I understand the Debtor will promptly seek to reject the Lease.

47. Upon rejection of the Lease, the Debtor intends to engage a real estate professional to assist the Debtor with the marketing and sale of the Property to the bidder submitting the highest and/or best offer, subject to Court approval. The Debtor anticipates the Property will be sold free and clear of all liens, claims, interests, and encumbrances (collectively, the "Liens"), with all such Liens to attach to net sale proceeds with the same validity, priority, force, and effect as existed immediately prior to a sale.

48. The Debtor also intends to propose a chapter 11 plan and distribute the net proceeds received from a sale of the Property in accordance with the terms of any confirmed chapter 11 plan.

## Part IV
## The First Day Motions

49. Concurrently with the filing of its chapter 11 petition, the Debtor has filed the First Day Motions seeking relief the Debtor believes is necessary to stabilize its assets, facilitate its business and operation in chapter 11, and administer its chapter 11 case and bankruptcy estate with minimal disruption while also preserving value for all interested parties.[11] The Debtor respectfully requests entry of orders granting the relief requested in the First Day Motions.

50. I have reviewed each First Day Motion discussed below and the facts set forth therein are true and correct to the best of my current knowledge, information, and belief. The

---

[11] Capitalized terms not otherwise defined in Part IV herein shall have the meanings given to such terms in the respective First Day Motion.

contents of the First Day Motions are based upon (a) my personal knowledge of the Debtor's history, assets, business, and finances, (b) information learned from my review of relevant documents, (c) information supplied to me by other individuals and by Debtor professionals, and/or (d) my opinion based upon the knowledge, experience, or information I have obtained or reviewed concerning the Debtor and its assets, business, and financial condition.  A short summary of the relief requested and the facts supporting each of the First Day Motions is set forth below.  The First Day Motions include:

a. *Debtor's Motion for Interim and Final Orders: (I) Approving the Continued Use of the Debtor's Cash Management System and Bank Account; (II) Extending the Debtor's Time to Comply with Section 345(b) of the Bankruptcy Code; and (III) Granting Related Relief* (the "Cash Management Motion");

b. *Debtor's Motion for Interim and Final Orders (A) Prohibiting Utility Providers from Altering, Refusing, or Disconnecting Service; (B) Approving the Debtor's Proposed Adequate Assurance of Payment for Postpetition Services; and (C) Establishing Procedures for Resolving Requests for Additional Adequate Assurance of Payment* (the "Utilities Motion");

c. *Debtor's Motion Pursuant to Sections 105(a), 362(d), 363(b), 363(c), and 503(b) of the Bankruptcy Code for an Order Authorizing the Debtor to Continue Commercial Property Insurance and Pay Related Obligations* (the "Insurance Motion");  and

d. *Debtor's Motion for Approval of Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Financing (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay and (V) Scheduling a Final Hearing* (the "DIP Motion").

### A.     The Cash Management Motion

51.     In the Cash Management Motion, the Debtor requests entry of an order authorizing, among other things, (a) continued use of its Cash Management System (in accordance with the DIP Budget) and the payment of related prepetition obligations, if any, (b) maintenance of the existing Bank Account, including a waiver of certain operating guidelines

relating to the Bank Account, and (c) an interim waiver of the deposit and investment requirements of section 345(b) of the Bankruptcy Code to the extent they apply to the Bank Account.

52. As described in the Cash Management Motion, maintaining the Property and operation of the Debtor's business requires the use of cash and a Cash Management System, including the Bank Account. The Cash Management System is essential to the Debtor's business and provides numerous benefits, such as enabling the Debtor to pay operating expenses, reducing administrative expenses, and facilitating the movement of funds.

53. The relief requested in the Cash Management Motion is vital to ensuring a seamless transition into bankruptcy. I believe the relief requested in the Cash Management Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to manage its assets and operate its business in chapter 11 with minimal disruption, thereby benefiting all parties in interest. Accordingly, for the reasons set forth herein and in the Cash Management Motion, on behalf of the Debtor I respectfully submit the Cash Management Motion should be approved on an interim and final basis.

**B.    The Utilities Motion**

54. In the Utilities Motion, the Debtor requests entry of interim and final orders (a) prohibiting Utility Providers from altering, refusing or discontinuing utility services or discriminating against the Debtor solely on the basis of the commencement of this case or that the Debtor did not pay a prepetition debt when due, (b) determining that adequate assurance of payment for postpetition utility services has been furnished to the Utility Providers and authorizing the Debtor to provide additional adequate assurance to the Utility Providers, as

necessary; and (c) establishing procedures for resolving future requests by any Utility Provider for additional adequate assurance of payment.

55.     In the ordinary course of business, the Debtor (and Receiver) obtains electric, gas and water/sewer services from several direct Utility Providers, all in connection with maintenance and preservation of the Property.  An average of approximately $1,825.00 per month is paid on account of all Utility Services.  The Debtor (and then, upon information and belief, the Receiver) generally has made payments to the Utility Providers on a regular and timely basis.  To the best of the Debtor's knowledge, there are no material defaults or arrearages with respect to undisputed invoices for Utility Services, other than payment interruptions that may be caused by commencement of this Chapter 11 Case.

56.     I am advised and believe the requested relief is necessary and essential to avoid harm to the Property and disruption of the Debtor's business.  Any such disruption could prejudice the value of the Debtor's assets and thereby cause immediate and irreparable harm to the Debtor's bankruptcy estate and its creditors.  Because the receipt of uninterrupted Utility Services is vital to continued maintenance and preservation of the Property and achievement of the objectives of this Chapter 11 Case, I submit the interim and final relief requested in the Utilities Motion is necessary and in the best interests of the Debtor and its estate.

        C.       **The Insurance Motion**

57.     The Debtor requests entry of an order authorizing, but not directing, the Debtor to (a) continue and, to the extent necessary, revise, extend, renew, supplement, or change the Debtor's prepetition Property Insurance, or enter into new insurance policies, if necessary, in the ordinary course of business and (b) pay certain prepetition and postpetition obligations with respect thereto.

58. In the ordinary course of business, the Property Insurance is maintained to protect the Property from damage or loss. I understand the Property is covered through a policy (Policy No. 12PRM09942201) (the "Insurance Policy") issued by National Fire & Marine Insurance (the "Insurance Carrier"), which policy remains effective through June 10, 2024.

59. I further understand the Property Insurance is financed through a premium finance agreement, dated June 6, 2023, with Bank Direct Capital Finance (the "Premium Finance Agreement" and together with the Insurance Policy, the "Insurance Program").

60. Under the Premium Finance Agreement, I understand ten (10) monthly payments in the amount of $3,668.73 are due beginning July 10, 2023 (collectively, the "Insurance Premiums"). The aggregate annual Insurance Premiums under the Property Insurance, including finance charges, is $46,343.22. As of the Petition Date, the Debtor does not believe that any prepetition obligations remain outstanding; however, out of an abundance of caution, the Debtor seeks authority, but not direction, to satisfy, in its discretion, any unpaid and outstanding prepetition Insurance Obligations.

61. On behalf of the Debtor, I respectfully submit that the relief requested in the Insurance Motion is required on an interim and final basis to avoid any immediate and irreparable harm and such relief requested is in the best interests of the Debtor's estate and its creditors.

D. **The DIP Motion**

62. By the DIP Motion, the Debtor seeks, among other things, authorization and approval to obtain DIP Financing under a multi-draw, postpetition debtor in possession term loan facility in the aggregate principal amount of $650,000, all as more fully described in the DIP Term Sheet attached as Exhibit 1 to the proposed Interim Order (generally, the "DIP Loan").

Under the DIP Term Sheet, the Debtor has the option to request an additional $250,000 at the approval of the DIP Lender, in its sole discretion. The DIP Lender has consented to the use of the DIP Loan proceeds and its prepetition Cash Collateral consistent with the budget attached as Exhibit A to the DIP Term Sheet (the "Budget").

63.     The Debtor requires immediate access to liquidity to ensure it is able to continue to preserve the value of its assets and the bankruptcy estate, all for the benefit of creditors. Without prompt access to Cash Collateral, the Debtor would be unable to continue to maintain the Property and fund the administration of this case, which would cause immediate and irreparable harm to the value of the Debtor's assets and business, to the detriment of all stakeholders.

64.     By the DIP Motion, and in exchange for the DIP Lender's agreement to provide DIP Financing, the Debtor seeks authority, among other things, to (a) pay certain transaction expenses (including the Initial Loan Fee and the Incremental Funding Fee, both of which are payable on the Maturity Date) as well as other fees, costs, and expenses, all as described in the DIP Term Sheet and, to the extent authorized in the DIP Orders, (b) grant to the DIP Lender customary DIP Liens in and upon all of the DIP Collateral, subject only to the Carve-Out and any Permitted Prior Liens, to secure the Postpetition Obligations, and (c) grant to the DIP Lender allowed superpriority administrative expense claim status for the Postpetition Obligations, subject only to the Carve-Out, in accordance with the terms of the DIP Orders.

65.     Additionally, through the DIP Motion, the Debtor seeks authority to use, in accordance with the Budget, the Prepetition Lender's Cash Collateral within the meaning of sections 363(a) and 363(c) of the Bankruptcy Code and to provide certain adequate protection in exchange, including Adequate Protection Liens, Adequate Protection Claims, and Adequate Protection Payments in accordance with the terms of the DIP Orders.

66. I submit the Debtor's bankruptcy estate will suffer immediate and irreparable harm if the relief requested in the DIP Motion is not granted. The Debtor is entering chapter 11 with minimal cash on hand, and thus access to DIP Financing and the use of Cash Collateral is critical to ensure smooth entry into chapter 11. The commencement of this Chapter 11 Case will place increased demands on the Debtor's liquidity due to, among other things, the costs of administering the Chapter 11 Case. The relief requested is necessary to avoid the immediate and irreparable harm that would otherwise result if the Debtor is denied the vital liquidity that would be provided through the proposed interim borrowing. Such interim borrowing will, among other things, provide stability, minimize disruption, and provide resources to administer this Chapter 11 Case.

67. While the Debtor has not solicited additional offers for postpetition debtor in possession financing from sources other than the DIP Lender, the Debtor submits that such effort would be futile in that the Debtor does not have any unencumbered assets to offer as collateral to support such alternate financing. Moreover, it is extremely unlikely any new lender would be willing to provide postpetition financing on an unsecured or junior basis to the prepetition liens of the Prepetition Lender and any other creditor (such as Multnomah County) that already encumber the Debtor's assets. Finally, any proposed postpetition financing on a priming basis would require at least the Prepetition Lender's consent, which consent it has not given. Thus, the Debtor submits the proposed postpetition financing is the only financing available. Furthermore, the Debtor negotiated the DIP Financing, the use of Cash Collateral, and the adequate protection set forth in the proposed DIP Orders in good faith and at arm's length. And, the Debtor believes the DIP Financing will provide sufficient liquidity to fund this Chapter 11 Case.

68. I submit the terms of the proposed DIP Term Sheet are reasonable and the best that could be obtained under the facts and circumstances of this Chapter 11 Case. I further submit the relief requested on an interim and final basis is necessary to avoid any immediate and irreparable harm and is in the best interests of the Debtor's estate and its creditors.

### Part V
### Conclusion

69. The Debtor believes this Case, and the strategy outlined above, represent the best and only way to accomplish and maximize a prompt sale of the Property and thereafter provide a meaningful return to creditors. For the reasons stated herein and in each of the First Day Motions, the Debtor respectfully requests that each of the First Day Motions be granted, together with such other and further relief as this Court deems just and proper.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my current knowledge, information, and belief, as formed after reasonable inquiry.

Executed on December 4, 2023.

*/s/ Todd Minnis*
Todd Minnis, in my capacity as President of Debtor
CAPREF Lloyd Center East, LLC