**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CAPREF LLOYD CENTER EAST, LLC[1] | Case No. 23-11942 (JTD) |
| Debtor. | **Initial Hearing Date and Time:**<br>**March 19, 2024 @ 10:00 am (ET)**<br>**(Bidding Procedures Only)**<br><br>**Objection Deadline:**<br>**March 12, 2024 @ 4:00 pm (ET)**<br>**(Bidding Procedures Only)** |

**MOTION FOR ENTRY OF (I) AN ORDER (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (B) SCHEDULING AN AUCTION AND SALE HEARING AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF; AND (C) GRANTING RELATED RELIEF; AND (II) AN ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES AND (B) GRANTING RELATED RELIEF**

Pursuant to sections 105, 363, 503, and 507 of Title 11 of the United States Code (as amended, the "Bankruptcy Code"), Bankruptcy Rules 2002, 6004, 9007, and 9014, and Local Rules 2002-1, 6004-1, and 9013-1, the above-captioned debtor and debtor in possession (the "Debtor") hereby moves (the "Motion") for entry of an initial order substantially in the form attached hereto as Exhibit A (the "Bidding Procedures Order"): (a) approving the proposed form of Bidding Procedures attached as Exhibit 1 to the Bidding Procedures Order; (b) approving the form and manner of auction and sale hearing notice (Exhibit 2 to the Bidding Procedures Order) (the "Auction and Sale Notice"); (c) scheduling certain dates with respect thereto; and (d) granting related relief.  The Debtor also seeks entry of a separate and later order approving the sale of

---

[1] The Debtor in this case, along with the last four digits of its federal tax identification number, is CAPREF Lloyd Center East, LLC (1920) and the location of its service address is 4514 Travis Street, Suite 208, Dallas, TX 75205.

substantially all of its assets, free and clear of all asserted liens, claims, interests, and encumbrances.[2]

In support of the Motion, the Debtor respectfully states as follows:[3]

## **JURISDICTION AND VENUE**

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated as of February 29, 2012.

2.      This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (N), and (O). Venue of this case and for the Motion is proper in this Court and this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory and other legal predicates for the relief requested herein are Bankruptcy Code sections 105(a), 363(b), 363(f), 363(k), 363(m), 503(b), and 507(a)(2), Bankruptcy Rules 2002, 6004, 9007, and 9014, and Local Rules 2002-1, 6004-1, and 9013-1.

4.      Pursuant to Local Rule 9013-1(f), the Debtor consents to this Court's entry of a final order in connection with this Motion to the extent it is later determined the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

---

[2] Consideration of any proposed asset sale transaction (a "Sale" or "Sale Transaction") will occur at a hearing (the "Sale Hearing") the Court is asked to schedule via entry of the Bidding Procedures Order. A preliminary form of proposed sale order is attached hereto as Exhibit B. That proposed form of sale order remains subject to further drafting, revisions, and negotiations with other parties, including any Purchaser. All rights are reserved. In advance of any Sale Hearing, the Debtor anticipates filing an amended form of proposed sale order.

[3] The first day declaration of Todd Minnis (the "First Day Declaration") is incorporated by reference herein in support of the relief requested. [Dkt. No. 3.] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration or the Bidding Procedures Order, as applicable.

## FACTUAL BACKGROUND

5.      On December 4, 2023 (the "Petition Date"), the above-captioned Debtor filed in this Court its voluntary chapter 11 bankruptcy petition.

6.      Information about the Debtor, its assets and business, and the facts and circumstances leading up to the Petition Date can also be found in the First Day Declaration.

**A.      The Debtor's Property and the Keystone Loan; Prepetition Receivership Proceedings; Postpetition Financing**.

7.      The Debtor, with assistance from its professionals, seeks to market and sell substantially all of its assets. The Debtor's primary asset is the land, buildings, and related improvements located at 1260 NE Lloyd Center, Portland, OR 97232 (hereafter, the "Property" and together with any other related assets up for sale, the "Assets").

8.      The Property is part of a larger shopping center and mall (together, the "Lloyd Center") located in Portland, Oregon (Multnomah County). The Property sometimes is referred to as the East Anchor Parcel.[4]

9.      To help pay for and finance its August 2016 purchase and the proposed development of the Property, the Debtor, as borrower, and Keystone Real Estate Lending Fund, L.P., as lender ("Keystone"), entered into that certain Term Loan Agreement (the "Loan Agreement") dated as of March 21, 2017, as well as other related agreements (together with the Loan Agreement, the "Loan Documents").

10.      Pursuant to the Loan Agreement, Keystone extended a loan to the Debtor in the original principal amount of $7,526,520.00 (the "Keystone Loan") to finance certain indebtedness secured by, among other things, the Property. The Keystone Loan is evidenced by, among other

---

[4] The Property formerly was owned and operated by Sears as a retail location. Other parcels comprising the Lloyd Center mall property include those sometimes referred to as the Enclosed Mall Parcels, the West Anchor Parcel, the North Parcels, and the South Superblock Parcel(s). Upon information and belief, those other parcels currently are owned by KKR Real Estate Finance Trust and/or its affiliates or partners.

things, that certain Secured Promissory Note dated March 21, 2017, in the original principal amount of the Keystone Loan. (*See also* First Day Declaration, ¶¶16-17.)

11.    The Keystone Loan is secured by, among other things, a Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing recorded in the Official Records of Multnomah County, Oregon, on March 24, 2017, as Instrument No. 2017-035671.

12.    The Debtor was and is in default under the Loan Documents by, among other things, failing to make required payments when due.

13.    In the spring of 2022, Keystone filed a complaint against the Debtor and Cypress Acquisition Partners Retail Fund, L.P. (as loan guarantor).  That lawsuit was filed in the Circuit Court of the State of Oregon, in and for Multnomah County, Case No. 22CV07952 (the "Receivership Proceedings").  The complaint alleged breach of the Loan Agreement and breach of guaranty.  As part of the relief sought, Keystone requested appointment of a receiver for its collateral (i.e. the Property).[5]

14.    The Property was not sold or otherwise disposed of during the Receivership Proceedings.

15.    As of the Petition Date, the amount due under the Loan Documents was at least $10,699,166.86.

16.    On the Petition Date, the Debtor filed its *Motion for Approval of Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay and (V) Scheduling a Final Hearing* (the "Financing Motion") [Dkt. No. 7.]

---

[5] On April 15, 2022, an order was entered appointing CFO Solutions LLC, d/b/a Amplêo (the "Receiver") as receiver for the Property.  Upon information and belief, the Receivership Proceedings remain open but subject to the bankruptcy automatic stay.

17.     As set forth more fully in the Financing Motion, Keystone agreed to provide the Debtor with postpetition financing in accordance with the terms and provisions set forth in the DIP Term Sheet attached to the Financing Motion.

18.     On January 4, 2024, this Court entered an order (the "Final Financing Order") approving the Financing Motion on a final basis. [Dkt. No. 42].

**B.     The Eastgate Contract and Debtor's Rejection Motion; Significant Creditors; Current Status of Property.**

19.     On the Petition Date, the Debtor also filed a motion to reject a certain contract (the "Eastgate Contract") it had entered into in late 2017 with contract counterparty Eastgate Theatre, Inc. ("Eastgate").[6]

20.     The Eastgate Contract was styled "Lease".  Pursuant to the Eastgate Contract, the Debtor agreed to construct a large movie theatre on the Property and lease it to Eastgate.  Once constructed, Eastgate as tenant was to occupy and operate the new movie theatre in exchange for paying the Debtor base rent, other sums, and other obligations.[7]

---

[6] *See* Debtor's *Motion for Entry of Order Authorizing Rejection of Contract (Contract Counterparty: Eastgate Theatre, Inc.)* (the "Rejection Motion") [Dkt. No. 8].  The full contents of the Rejection Motion will not be repeated here but they are incorporated by reference as if set forth herein.  This includes the multiple exhibits attached to the Rejection Motion, including a copy of the Eastgate Contract attached thereto as Exhibit 2.  Certain of those exhibits, including the Eastgate Contract, may be referred to or cited in this Motion.

Eastgate was one of over 100 affiliate debtors in the recent Regal Cinema bankruptcy cases. S*ee* Main Case No. 22-90168 (Bankr. S.D. Tex.) (MI) (Cineworld Group plc as lead debtor).  A joint plan of reorganization was confirmed on June 28, 2023. [Tex. Bankr. D.I. 1982.]  The confirmed Plan went effective on July 31, 2023. [Tex. Bankr. D.I. 2067.]  Upon information and belief, the Eastgate Contract was listed as an assumed unexpired lease under the confirmed Plan and related Plan Supplement and then purportedly assigned to a newly formed entity referred to as New RCI Holdings, Inc. ("New RCI") [*see* Tex. Bankr. D.I. 2043, page 46 of 134.]  References to Eastgate herein will be deemed to include and encompass the original contract counterparty and New RCI, as necessary and appropriate.

[7] Upon information and belief, Eastgate continues to operate its existing movie theatre located in a different portion of the Lloyd Center.

21.     Movie theatre construction, however, never even began at the Property.  Eastgate did not occupy, take possession, or otherwise operate in business from the Property and Eastgate never paid any rent or other obligations under the terms of the Eastgate Contract.[8]

22.     On January 3, 2024, the Court entered an order rejecting the Eastgate Contract, effective as of the Petition Date. [Dkt. No. 30.]

23.     In addition to defaulting on its obligations owed to Keystone and not performing under the Eastgate Contract, the Debtor also is delinquent on unpaid real property taxes, plus penalties and interest, with respect to the Property.  These amounts are due and owing to Multnomah County.  Real property taxes, at least in large part, have not been paid since the 2020 tax year.[9]

24.     The Property currently sits vacant and unoccupied, with no current tenants.  The Debtor continues to maintain, insure, and administer the Property during this bankruptcy case.

**C.    Real Estate Broker; Marketing of the Assets.**

25.     Subject to Court approval, and with the assistance of a real estate broker, Hilco Real Estate, LLC ("Hilco") the Debtor seeks to employ under separate request,[10] the Debtor intends to promptly market and sell the Property to a bidder submitting the highest and/or best offer in accordance with the proposed Bidding Procedures described below.

26.     Hilco has the requisite experience and contacts in the commercial real estate industry to assist the Debtor with the conduct of a fulsome and robust marketing process designed to achieve

---

[8]  While reserving all rights with respect to the proper characterization of the Eastgate Contract for Bankruptcy Code purposes, the Debtor in the Rejection Motion took the position that as an executory contract or unexpired lease under section 365 of the Bankruptcy Code, it can and should be rejected, effective as of the Petition Date.

[9] Multnomah County has filed a proof of claim asserting a secured claim in the amount of $598,348.28 for unpaid real estate taxes, penalties and interest relating to tax years 2020-2023.

[10] *See* Debtor's application to employ Hilco Real Estate, LLC as its Real Estate Broker, effective as of February 21, 2024.

the highest and/or best offer for the Property and related Assets.  That Hilco-led marketing process will commence immediately.

27.    As part of this marketing process, Hilco will reach out to or otherwise communicate with its extensive database of potential acquirers located in the United States and abroad, including mall property owners and operators, financial institutions, real estate investors, and other strategic buyers, all of which are considered parties who may have interest in a purchase of assets such as the Property.  An extensive print and digital marketing process is contemplated.  Parties known (either to the Debtor or Receiver) to have previously expressed an interest in the Property also will be contacted to gauge any continuing or renewed interest under the current circumstances presented. All potentially interested parties will be provided with initial marketing materials concerning the Assets.  Hilco and Debtor management teams will remain available to respond to questions and provide additional information, subject to appropriate confidentiality provisions.

28.    In addition to identifying and communicating with potential bidders, the Debtor and Hilco have and will collect and organize diligence materials for inclusion in a virtual data room. Data room access will be provided to interested parties executing confidentiality agreements during the sale and marketing process.

29.    The Debtor expects additional parties will become aware of the potential sale of the Property as the sale and marketing process picks up steam, thus driving even more bidder interest, participation, and competition over the next several weeks.

**RELIEF REQUESTED**

30.    The Debtor seeks entry of the Bidding Procedures Order in the proposed form attached hereto as Exhibit A:

(a)    authorizing and approving the Bidding Procedures attached as Exhibit 1 to the Bidding Procedures Order;

(b)    approving the form and manner of the Auction and Sale Notice

(<u>Exhibit 2</u> to the Bidding Procedures Order) and the form of notice of Winning Bidder (the "<u>Winning Bidder Notice</u>") (<u>Exhibit 3</u> to the Bidding Procedures Order);

(c)     scheduling certain dates and setting certain deadlines with respect thereto; and

(d)     granting related relief.

31.     At or following a Sale Hearing, the Debtor also will seek entry of a sale order (the "<u>Sale Order</u>") approving the sale of Assets to the Winning Bidder.

**A.     The Proposed Marketing and Sale Schedule**.

32.     Pursuant to the Bidding Procedures, the Debtor will solicit the highest or otherwise best offers for the Assets according to the following proposed schedule, subject to Court approval and availability:

| <u>Date and Time</u><br>(all Eastern Time) | <u>Event or Deadline</u> |
|---|---|
| April [17], 2024 @ 5:00 p.m. | Qualified Bid Deadline |
| April [24], 2024 @ 10:00 a.m. | Auction (if required) |
| April [25], 2024 @ 4:00 p.m. | File Notice of Winning Bidder (if Auction held) |
| April [4], 2024 @ 4:00 p.m. | Initial Sale Objection Deadline |
| April [30], 2024 @ 4:00 p.m. | Supplemental Sale Objection Deadline |
| May [3], 2024 @ [TBD] | Sale Hearing to Consider Approval of Winning Bid (or Backup Bid, as applicable) |

33.     The Debtor, in consultation with its advisors, believes the proposed marketing, bidding, and sale timeline will achieve a balance between a thorough marketing and sale process designed to maximize value of the Property, on the one hand, with the Debtor's need to proceed expeditiously and efficiently so as to minimize continuing drain and comply with the terms and provisions of the Debtor's approved postpetition financing, on the other hand.

34.     In addition to the marketing efforts conducted thus far, the Debtor and Hilco will utilize the time prior to, and after, entry of the Bidding Procedures Order to actively market the Assets

and encourage bids in advance of the proposed April 17 Bid Deadline.

35.     In light of the foregoing, the Debtor believes in the exercise of its reasonable business judgment that the proposed bidding and sale schedule is reasonable and in the best interests of the bankruptcy estate; will assist in establishing whether and to what extent a market exists for the Property; and provides creditors, bidders, and other parties in interest with sufficient notice, time, and opportunity to participate in the Debtor's sale proceedings. The Debtor submits the proposed schedule will result in the highest and/or best bid for the Assets under the circumstances presented.

**B.     The Bidding Procedures.**

36.     To assist with the solicitation, receipt, and evaluation of bids, the Debtor has developed and proposed the Bidding Procedures attached as <u>Exhibit 1</u> to the Bidding Procedures Order.

37.     The proposed Bidding Procedures are designed to foster a fair, efficient, competitive, and value-maximizing sale process for the Assets. They are fairly straightforward, given the narrow list of Assets available for sale (primarily the Property). The proposed Bidding Procedures compare favorably to procedures typically approved in bankruptcy cases pending in this Court. The Bidding Procedures will provide potential bidders with ample notice and opportunity to conduct thorough due diligence prior to submitting binding bids in advance of a Sale Hearing (proposed to be held on or about May 3, 2024, subject to Court availabilty). A fulsome marketing process has commenced. The Bidding Procedures are designed to encourage all prospective bidders to submit a Qualified Bid on or before the Bid Deadline. The Bidding Procedures will assist and facilitate the creation of a path toward entry of a Sale Order approving the Winning Bid (or Backup Bid, as applicable).

38.     In part as an effort to comply with the requirements of Local Rule 6004-1(c), and in addition to the other disclosures made herein, the following summary highlights certain key

provisions of the proposed Bidding Procedures Order (Exhibit A attached hereto) and proposed

Bidding Procedures (<u>Exhibit 1</u> to the Bidding Procedures Order):[11]

| | |
|---|---|
| **Assets to be Sold** | The Debtor is offering for sale all of the Assets, including the Property.  Bidders may choose to bid on the Property and any other Assets. |
| **Provisions Governing Qualification of Bidders** | Any person or entity (each, a "<u>Potential Bidder</u>") that wishes to participate in the bidding process**,** conduct due diligence and gain access to a confidential electronic data room concerning the Assets (the "<u>Data Room</u>"), must submit to the Debtor and its advisors an executed confidentiality agreement in form and substance reasonably acceptable to the Debtor and its advisors that includes, without limitation: |
| | (a)  information identifying the interested party, its principals, affiliates, and insiders, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding a potential Sale Transaction; |
| | (b)  a description of any connections the Potential Bidder, its affiliates, and/or related persons or insiders have to the primary parties and creditors in the bankruptcy case;  and |
| | (c)  a statement, to the Debtor's reasonable satisfaction, that the Potential Bidder has a *bona fide* interest in purchasing any or all of the Assets, is likely to be able to submit a Qualified Bid by the Bid Deadline, and has the financial ability to consummate a proposed Sale. |
| | [*See e.g.* Bidding Procedures, §3.] |
| **Due Diligence** | Any Potential Bidder that meets the above requirements, unless waived by the Debtor, will be provided with reasonable access to the Data Room and any other additional information the Debtor believes to be reasonable and appropriate under the circumstances. |

---

[11] The summary is not intended to be exhaustive, recite verbatim, or otherwise use exactly matching language when describing the terms and provisions of the proposed Bidding Procedures Order and Bidding Procedures.  If there is any inconsistency between this summary and the actual proposed Bidding Procedures Order or Bidding Procedures, the latter control.  Parties in interest are encouraged to review all in their entirety.

The due diligence period shall extend through and including the Bid Deadline. The Debtor may (but need not) in its discretion furnish due diligence information to Qualified Bidders after the applicable bid deadline.

[*See* Bidding Procedures, §4.]

**Right to Credit Bid**

Unless the Court orders otherwise, and subject to the Bidding Procedures Order and Bidding Procedures, any bidder who has a valid and perfected lien on any Assets shall have the right to credit bid on such Assets within the meaning of and in accordance with Bankruptcy Code section 363(k).

[*See* Bidding Procedures, §9.]

**Bid Deadline**

Any Bidder that has complied with the above and wishes to submit a bid shall deliver a written and electronic copy of its bid in both PDF and MS-WORD format to the Debtor and its advisors so as to be received on or before April 17, 2024, at 5:00 p.m. (prevailing Eastern Time) (the "<u>Bid Deadline</u>"); provided that the Debtor may extend the Bid Deadline for any bidder without further order of the Court.  Any party that does not submit a qualified bid by the Bid Deadline (including as may be extended) will not be allowed to (a) submit any bid after the Bid Deadline (as may have been extended), or (b) participate in any Auction.

[*See* Bidding Procedures, §§1, 7.]

**Provisions Governing Qualified Bids**

Any Bidders intending to submit bids must include with their bids a proposed and executed asset purchase agreement (a "<u>Purchase Agreement</u>").  The Purchase Agreement shall be substantially similar to any form of purchase agreement included in the Data Room and any bid shall include a redline marked against any proposed form of purchase agreement included in the Data Room.

To be deemed a "<u>Qualified Bid</u>," a bid must be received on or before the applicable Bid Deadline and must satisfy certain specified requirements, as determined by the Debtor in consultation with any Consultation Parties.  For example, Qualified Bids must**:**

(a)     be in writing and be binding and irrevocable for the time period specified in the Bidding Procedures;

(b)     fully disclose the identity of the bidder (and any other party participating in the bid) and provide the contact information of the specific person(s) whom Debtor or its advisors should contact if Debtor has any questions or wishes to discuss the bid;

(c)     set forth the purchase price to be paid and for the avoidance of doubt, the Debtor retains discretion to reject any bid for insufficient or inadequate purchase price;

(d)     if a bid includes a credit bid, evidence of the amount of the associated claim, the Assets constituting the collateral securing the claim, and evidence of the grant, perfection, priority, and validity of the asserted lien (the "Secured Claim Documentation");[12]

(e)     not propose payment in any form other than cash (except as otherwise expressly set forth in the Bidding Procedures Order or the Bidding Procedures, such as in the case of credit bids);

(f)     include an allocation of cash to the Assets proposed to be purchased;

(g)     state the liabilities proposed to be paid or assumed by such bidder in its proposed Purchase Agreement;

(h)     specify the Assets included in the bid;

(i)     contain such financial and other information to allow the Debtor to make a reasonable determination as to the bidder's financial and other capabilities to close the transactions contemplated by the proposed Sale Transaction, including the bidder's financial wherewithal to pay the full purchase price and otherwise close the proposed Sale Transaction in the required timeframe;

(j)     not contain any contingencies of any kind, including, without limitation, contingencies related to financing, internal approval, or due diligence;

(k)     contain a written acknowledgement and representation that the bidder (i) has had an opportunity to conduct any and all due diligence regarding the Assets, (ii) has relied solely upon its own independent review, investigation, and/or inspection of

---

[12] Parties intending to submit a credit bid are encouraged to provide their Secured Claim Documentation to counsel for the Debtor sufficiently prior to the Bid Deadline to ensure the Secured Claim Documentation can be reviewed and validated as of the Bid Deadline and submission of any purported credit bid.

any documents and other information in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any documents or other information provided in connection with the Bidding Procedures and the proposed Sale Transaction;

(l)    confirm the bidder has acted in good faith and will continue to operate in good faith with respect to any submitted bid for the Assets, and has not engaged in collusion or other prohibited and improper conduct with any other bidders for the Assets;

(m)    provides the bidder will serve as a backup bidder (the "Backup Bidder") if the bidder's bid is the next highest and best bid (the "Backup Bid") selected after the Winning Bid;

(n)    includes written evidence of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of the subject bid;

(o)    provides for making a good faith cash deposit (the "Deposit") in an amount equal to ten percent (10%) of the purchase price provided for in the bid, with the Deposit to be held in trust by the Debtor or one of its advisors in accordance with the Bidding Procedures Order and Bidding Procedures, and confirms the bidder will increase any posted Deposit as required under the Bidding Procedures; and

(p)    provides that in the event of the bidder's breach of, or failure to perform under, a selected and approved Winning Bid or Backup Bid, the Debtor shall be entitled to keep as liquidated damages any Deposit furnished by bidder, without prejudice to any other rights, claims, or remedies the Debtor may have and pursue.

The Debtor reserves the right, in consultation with any Consultation Parties, to negotiate with any bidder in advance of an Auction to cure any deficiencies in a bid not initially deemed a Qualified Bid.

Each bidder submitting a bid shall be deemed to: (a) acknowledge and represent it is bound by all of the terms and conditions of the Bidding Procedures Order and Bidding Procedures; and (b) waive the right to pursue a substantial contribution claim under Bankruptcy Code section 503 related in any way to the submission of its bid, the Bidding Procedures, or any Sale Transaction.  Each bidder determined to have submitted a Qualified Bid shall be a "<u>Qualified Bidder</u>".

[*See e.g.* Bidding Procedures, §§5, 8, 9.]

|  |  |
|---|---|
| **No Auction if no Competing Bids** | If only one timely Qualified Bid is received, the Debtor shall not hold an Auction and may request at the Sale Hearing that the sole Qualified Bidder be deemed the Winning Bidder and that the Court approve the Winning Bid and the transactions contemplated thereunder.<br><br>[*See* Bidding Procedures, §10.] |
| **Evaluation of Bids** | The Debtor in its discretion shall make a determination regarding whether a timely submitted bid is a Qualified Bid, and shall notify all Qualified Bidders as soon as reasonably practicable whether their bids have been determined to be a Qualified Bid.  If a bid is determined not to be a Qualified Bid, including with respect to any proposed credit bid, the bidder shall be notified and in Debtor's discretion may be provided an opportunity prior to commencement of an Auction to address noted deficiencies and modify its bid in order to constitute a Qualified Bid under the Bidding Procedures; *provided further,* that any Qualified Bid may be improved at an Auction during Auction bidding.<br><br>Prior to commencing an Auction, the Debtor shall determine which of the Qualified Bids is the highest or best bid for purposes of constituting the opening bid at the Auction (the "<u>Baseline Bid</u>"), and shall notify all Qualified Bidders of the Baseline Bid.<br><br>[*See* Bidding Procedures, §§8, 10.] |
| **Auction** | If the Debtor receives more than one Qualified Bid for the Assets, the Debtor shall conduct an Auction.  Following the Auction, the Debtor will determine, in consultation with any Consultation Parties, which Qualified Bid is the highest or best bid for the Assets.<br><br>The Auction shall be governed by the following procedures: |

(a)      the Auction shall commence on April [24], 2024, at 10:00 a.m. (ET), likely via Zoom or some other videoconferencing platform, at the election of the Debtor.

(b)      only Qualified Bidders shall be entitled to participate in bidding at the Auction;

(c)      all Qualified Bidders shall appear and participate at the Auction, through duly authorized representative(s);

(d)      only the Debtor, Qualified Bidders and their representatives, and any creditors, together with any professional advisors to each of the foregoing parties, may attend the Auction; provided that any creditors desiring to attend the Auction must provide counsel for the Debtor at least two (2) business days written notice of their intent to attend any Auction and the identities of their respective attending designees;

(e)      the Debtor and its professional advisors shall direct and preside over the Auction, which shall be transcribed;

(f)      at the Auction, the Auction participants shall confirm they have not and will not engage in any collusion with respect to the sale process, bid submissions, the Auction, a Sale Hearing, or the proposed Sale Transaction;

(g)      Auction bidding shall commence with the Qualified Bid deemed by the Debtor to be the highest and/or best initial offer for the Assets, and Qualified Bidders may submit increased bids in increments of $50,000.00 over the current highest and best bid in a particular round of bidding (the "Minimum Overbid Increment"); provided that: (i) each  successive bid must be a Qualified Bid; and (ii) the Debtor shall retain the right to modify at the Auction any bid increment requirements; provided, further, the Debtor, in consultation with any Consultation Parties, reserves the right to modify the Minimum Overbid Increment during the course of the Auction and shall do so on the record at the Auction;

(h)      the Auction may include individual and private negotiations with any of the participating Qualified Bidders, but all formal bids shall be made on the record and in the presence of all then-participating Qualified Bidders;

(i)      all material terms of the bid deemed the highest and best bid for each round of bidding shall be fully disclosed to the participating Qualified Bidders, and the Debtor shall use

reasonable efforts to clarify any issues participants may raise regarding announcement of the then-current highest and best bid;

(j)      the Debtor and its professional advisors may adopt at the Auction additional procedural rules deemed appropriate under the circumstances (e.g., the amount of time allotted to make subsequent bids) for conducting the Auction, provided that such additional rules are (i) not inconsistent with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or any applicable order of the Court and (ii) disclosed to all participating bidders;

(k)      each participating bidder shall be deemed to (i) waive any right to a jury trial in connection with, and consent and submit to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating to the submission of bids, the Bidding Procedures, the Auction, the Sale, the Sale Order, the Sale Hearing, or the interpretation and enforcement of the contemplated Sale documents, (ii) agree to file any such action or proceeding in the Court, and (iii) consent to the Court entering any final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions by suit or in any other manner provided by applicable law.

Participating bidders shall have the right to make additional modifications to their respective Purchase Agreements in conjunction with each bid submitted in each round of Auction bidding, provided that (i) any such modifications on an aggregate basis and viewed in whole, shall not, in the Debtor's discretion be less favorable to the Debtor and its estate than the terms of the bidder's most-recently submitted bid, as applicable, and (ii) each bid submitted at the Auction shall constitute an irrevocable offer and shall be binding on the bidder submitting such bid as provided in the Bidding Procedures;

(a)      the Debtor shall have the right to request any additional financial information that will allow the Debtor to make a reasonable determination as to a Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by their current bid, as may be further amended during the Auction, and any further information the Debtor may believe is reasonably necessary to clarify and evaluate any bid made during the Auction;

(b)     upon conclusion of the Auction, the Debtor shall determine, subject to Court approval, the bid that is the highest or otherwise best bid for the Assets (the "Winning Bid").  In making this decision, the Debtor shall consider items such as the amount of the purchase price, the likelihood of the bidder's ability to close a transaction and the timing thereof, the nature and impact of any variances from the Debtor's form purchase agreement, and the net benefit to the Debtor's estate.  The bidder submitting the Winning Bid shall become the "Winning Bidder," and shall have such rights and responsibilities as set forth in the Winning Bid. The Debtor may, in its sole discretion, designate a Backup Bid (and the corresponding Backup Bidder) to purchase the Assets in the event the Winning Bidder does not close its proposed Sale Transaction; and

(c)     prior to a Sale Hearing, the Winning Bidder shall complete and execute all agreements, contracts, instruments, and other documents evidencing and containing the terms and conditions upon which the Winning Bid was made.

**THE WINNING BID AND ANY BACKUP BID SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE WINNING BIDDER AND THE BACKUP BIDDER, RESPECTIVELY, IN ACCORDANCE WITH THE BIDDING PROCEDURES**

[*See* Bidding Procedures, §§1, 10.]

**Sale Hearing**

The Winning Bid and any Backup Bid will be subject to Court approval. The hearing to approve such Winning Bid and any Backup Bid (the "Sale Hearing") shall occur, subject to the Court's availability, on or about May 3, 2024.

The Sale Hearing may be adjourned from time to time without further notice to creditors or other parties in interest other than by the Debtor's announcement of the adjournment in open court or by the Debtor filing a written notice or hearing agenda prior to conduct of a Sale Hearing.

**For the avoidance of doubt, the Debtor may determine, in consultation with any Consultation Parties, to withdraw the Assets (or any subset thereof) from the Auction and sale process and adjourn or cancel the Sale Hearing with respect to the Assets.**

At the Sale Hearing, the Debtor will seek entry of an order that, among other things: (i) authorizes and approves the Sale to the Winning Bidder (and, if applicable, the Backup Bidder), pursuant to the terms and conditions set forth in the applicable Winning Bid and Backup Bid (if any), and that the Assets being sold in such transaction shall be sold free and clear of all liens, claims, interests, and other encumbrances (together, "Liens") pursuant to Bankruptcy Code section 363(f); (ii) unless otherwise ordered by the Court, directing that all Liens shall attach to the net proceeds generated from the Sale, in the same order of priority and with the same validity, force and effect as existed immediately prior to consummation of such Sale; (iii) finding that the Winning Bidder (and Backup Bidder, as applicable) is a good faith purchaser pursuant to Bankruptcy Code section 363(m); and (iv) as appropriate, waives any automatic stay of the order provided for in Bankruptcy Rule 6004.

[*See* Bidding Procedures, §§1, 13, 17; *see* proposed Sale Order, ¶¶2.4, Section 3, 6.2, 6.8].

| | |
|---|---|
| **Modification of the Bidding Procedures** | Notwithstanding any of the foregoing, the Debtor reserves the right, upon consultation with any Consultation Parties, to modify the Bidding Procedures at or prior to the Auction, including, without limitation, to extend deadlines, allow for bidding on only a portion of the Assets, modify bidding increments, modify Deposit requirements, impose additional terms and conditions with respect to any or all actual or potential bidders, adjourn or cancel the Auction at or prior to the Auction, and adjourn or cancel the Sale Hearing.<br><br>[*See e.g.* Bidding Procedures, §§8, 10(i), 12, 15.] |
| **Closing with Backup Bidder** | Notwithstanding any of the foregoing, if the Winning Bidder fails to close the Sale by the date specified in the Winning Bid (or such date as may be extended by the Debtor, in consultation with any Consultation Parties), and a Backup Bid was selected by the Debtor following conclusion of an Auction, the Backup Bid will then be deemed the Winning Bid, the Backup Bidder will be deemed the Winning Bidder, and the Debtor will be authorized, but not directed, to finalize Sale documentation and close the Sale to the Backup Bidder as soon as practicable thereafter, without need for further Court order.<br><br>[*See* Bidding Procedures, §11.] |

| | |
|---|---|
| **Return of Deposits** | All Deposits shall be returned to each bidder not selected by the Debtor as the Winning Bidder or the Backup Bidder. The deposit of the Winning Bidder (or, if the Sale is closed with the Backup Bidder, the deposit of the Backup Bidder), shall be applied at closing to the Sale purchase price. If the Winning Bidder (or, the Backup Bidder, as applicable) fails to consummate the Sale because of a breach or failure to perform on the part of such bidder, then the Debtor and its estate shall be entitled to retain all Deposits received from said defaulting bidder, as applicable, as part of the damages resulting to the Debtor and its estate for such bidder's breach or failure to perform. The Debtor and its estate may have additional rights claims, or remedies to assert in such instance.<br><br>[*See* Bidding Procedures, §18.] |
| **Consultation Parties** | The term "Consultation Parties" as used herein shall mean and include any party the Court directs to be a Consultation Party.<br><br>For the avoidance of doubt, any consultation rights provided to any Consultation Parties shall not limit the Debtor's discretion in any way and shall not include the right to veto any decision made by the Debtor in the exercise of its business judgment.<br><br>[*See* Bidding Procedures, §2.] |

39.     Based upon the above, the Debtor respectfully requests entry of the Bidding Procedures Order and Bidding Procedures attached thereto.

## BASIS FOR RELIEF

### A.     Entry of the Bidding Procedures Order is in the Best Interests of the Bankruptcy Estate.

40.     Courts have made clear a debtor's business judgment is entitled to substantial deference with respect to a sale of estate property. *See, e.g. In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [Debtor] to show that a sound business purpose justifies such actions. If the [Debtor's] decision evidences a sound business purpose, then the Bankruptcy Court

should approve the sale.") (quoting *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999)); *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'" (internal citations omitted)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (quoting *In re Schipper*).

41.    The paramount goal in any proposed sale of estate property is to maximize the proceeds received.  *See In re Adams Res. Expl. Corp.*, No. 17-10866, 2017 WL 5484017, at *3 (Bankr. D. Del. Sept. 20, 2017) ("The relief requested in the Sale Motion . . . is a necessary and appropriate step toward enabling the Debtor to maximize the value of its bankruptcy estate, and it is in the best interests of the Debtor, its estate and its creditors."); *In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (debtor in possession "had a fiduciary duty to protect and maximize the estate's assets").

42.    To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sale transactions.  Absent unusual or special circumstances, proposed sale and bidding procedures also should be evaluated under the business judgment standard. *See, e.g.*, *In re Dura Auto, Sys.*, No. 06-11202, 2007 WL 7728109, at *90 (Bankr. D. Del. Aug. 15, 2007) (bidding procedures "enhance[ing] competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales"); *In re Integrated Res., Inc.*, 147 B.R. 650, 656-57, 659 (S.D. N.Y. 1992) (noting bidding procedures negotiated by a trustee are to be reviewed according to the deferential "business judgment" standard; under that standard, such procedures and arrangements are "presumptively valid"; further noting bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Trans World Airlines,*

*Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. Apr. 2, 2001) (while a "section 363(b) sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").[13]

43.    The Debtor believes the proposed Bidding Procedures are designed to promote active bidding and elicit the highest or otherwise best offers available for the Property and any related Assets.  The proposed Bidding Procedures will allow the Debtor to conduct a sale process in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Property and who can demonstrate the ability to close a transaction with no undue delay.  Specifically, the Bidding Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform any required due diligence and acquire the information necessary to submit a timely and well-informed bid.

44.    At the same time, the Bidding Procedures provide the Debtor with a robust opportunity to receive and consider competing bids and select the highest or otherwise best offer as the Winning Bid.   As such, creditors can be assured the consideration ultimately obtained for the Property will be fair and reasonable and the best offer available under the circumstances presented.

45.    The Debtor submits the proposed Bidding Procedures are supported by sound business purpose and are a proper exercise of the Debtor's business judgment.  The Bidding Procedures will encourage competitive bidding, are appropriate under the relevant standards

---

[13]  Entry of the Bidding Procedures Order also is appropriate under section 105(a) of the Bankruptcy Code. That section provides this Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

governing bidding and sale procedures in bankruptcy cases, and are consistent with procedures approved by this Court in many other bankruptcy cases.

> **1.    The form and manner of service of the Auction and Sale Notice should be approved**.

46.    Pursuant to Bankruptcy Rule 2002(a), creditors are entitled to 21 days notice of the proposed Sale.   And in accordance with  Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction, generally describe the assets up for sale, and set forth the deadline for filing any objections to the relief requested.

47.    Within three business days of entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtor will serve the Auction and Sale Notice upon the following parties or their respective counsel, if known:  (a) counsel for the Office of the United States Trustee for the District of Delaware; (b) counsel for Keystone; (c) counsel for the Receiver; (d) counsel for Eastgate; (e) Multnomah County (Portland, Oregon); (f) all parties known to have expressed a written interest in purchasing some or all of the Assets; (g) the Internal Revenue Service; (h) the offices of the attorneys general for Oregon, Texas, and Delaware; (i) the Debtor's largest unsecured creditors, as included along with the bankruptcy petition; and (j) all parties that have filed requests for notice pursuant to Bankruptcy Rule 2002.

48.    The Debtor submits notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Auction and Sale Notice as provided for herein, constitutes good and sufficient notice of the proposed Sale and the relief requested with respect thereto and complies with all applicable requirements of Bankruptcy Rule 2002. Accordingly, the Debtor requests approval of the form and manner of service of the Auction and Sale Notice.[14]

---

[14]   In connection with requesting entry of the Bidding Procedures Order, the Debtor also requests approval of the proposed forms of the Winning Bidder Notice (Exhibit 3 to the Bidding Procedures Order).

**B.**  **The proposed sale of Assets is supported by sound business purpose and is an appropriate exercise of the Debtor's sound business judgment.**

49.    By this Motion, the Debtor also seeks entry of an order approving the sale of the Assets pursuant to sections 363(b) and 363(f) of the Bankruptcy Code. The Debtor submits ample authority exists in support of Court approval.[15]

50.    In accordance with Local Rule 6004-1(b), the Debtor highlights the following aspects of the proposed Sale and Sale Order:[16]

- ■ Auction Date (proposed): April 24, 2024.

- ■ Sale proceeds may be used to pay, among other things, usual and customary fees and costs required to facilitate and implement a Sale Transaction of this nature, and fees and costs payable to Hilco pursuant to the terms of its employment agreement and employment order. Upon consummation of a Sale Transaction, the Debtor also may make any payments required to be made under and consistent with the terms and provisions of the Final Financing Order or any further order of the Court. [*See* Sale Order, §5.]

- ■ The Debtor anticipates proposed purchaser(s) (other than any credit bidders) will be required to submit with their respective bids cash deposits equal to 10% of the applicable bid purchase price, as subject to the Bidding Procedures Order and Bidding Procedures and as subject to increase pursuant to any further bidding that occurs. [*See e.g.* Bidding Procedures, ¶¶5.3, 18.]

- ■ The Debtor anticipates any proposed purchaser will insist upon inclusion of usual and customary findings and conclusions in a Sale Order relating to its good faith purchaser status (Bankruptcy Code section 363(m)) and the fact purchaser is not a successor, alter ego, mere continuation, or substantial continuation of the Debtor or its bankruptcy estate. [*See e.g.* Sale Order, ¶N, §§3.11, 3.12]

- ■ The Debtor intends to request entry of a Sale Order approving a sale of the Assets "free and clear" of all Liens or Adverse Interests (as defined below), including any leasehold interests or other interests asserted by Eastgate, with all such Liens or Adverse Interests to attach to net Sale proceeds with the same priority and the same validity, force, and effect as existed immediately prior to a Sale Closing. [*See e.g.* Sale Order, §3]

---

[15]  *See* preliminary proposed form of Sale Order attached hereto as Exhibit B.

[16]  The Debtor at this time does not have a proposed purchaser of the Assets or a proposed Sale Transaction. The following disclosures therefore necessarily are preliminary and informational in nature and remain subject to change and future developments.

- ■ The Debtor seeks Court approval of credit bidding rights potential purchasers may wish to exercise in bidding on the Assets, consistent with section 363(k) of the Bankruptcy Code. [*See* Bidding Procedures Order, ¶20]

- ■ The Debtor intends to close a Sale Transaction as soon as possible after receiving approval at a Sale Hearing.

- ■ The Debtor seeks relief from the 14-day stay under Bankruptcy Rule 6004(h) and any other applicable rule so that an approved Sale may proceed expeditiously to Closing following a Sale Hearing. [*See* Sale Order, ¶V, §6.8].

51.    Section 363(b) of the Bankruptcy Code permits a debtor to sell assets outside of the ordinary course of business. It provides, in pertinent part, "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

52.    As discussed above, a sale of the debtor's assets should be authorized pursuant to section 363(b) of the Bankruptcy Code if a sound business purpose exists for the proposed transaction. *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 145-47 (3d Cir. 1986) (implicitly adopting the articulated business justification and good faith tests of *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983)); *In re Delaware & Hudson R.R. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (concluding Third Circuit adopted a "sound business purpose" test in *Abbotts Dairies*); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate . . . courts require the debtor to show that a sound business purpose justifies such actions"); *In re Martin*, 91 F.3d 389, 395 (3d. Cir. 1996).[17]

---

[17]  *See also* 11 U.S.C. §105(a) ("[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."); Fed. R. Bankr. P. 6004 (sales outside the ordinary course of business may be by private sale or public auction).

53.     Once a debtor articulates a valid business justification, the business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company." *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill 1995) (citations omitted); *In re Filene's Basement, LLC*, No. 11-135-11, 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate") (citations omitted).

54.     Here, the Debtor respectfully submits a prompt sale of the Assets is both warranted and reasonable, for a number of reasons.  It clearly is supported by sound business purposes.

55.     The Property currently sits vacant, with no current tenants; at present, it represents a drain on the bankruptcy estate (in the form of continuing monthly costs to insure, secure, and maintain it, accruing and unpaid annual real estate taxes, etc.).  Sale of the Assets will be subject to a robust marketing and bidding process run with the assistance of a qualified and experienced commercial real estate broker.  A "market check," in the form of an auction (should qualified and competing bids be received), will enhance the Debtor's ability to receive the highest or otherwise best available value for the Assets and provide a greater recovery for the estate than any other known alternatives.

56.     A prompt and value-maximizing sale of the Property is the only viable path to any creditor recoveries in this case.  To that end, the Debtor seeks to move forward with a sale of the Property and related Assets.  A sale clearly is justified and necessary and therefore constitutes an exercise of sound business judgment.

**1.  A proposed sale of the Property will be a fair value transaction.**

57.     Utilization of a court-approved auction process can be viewed as the best available

option for a debtor to determine value of assets up for sale; exposure to the market generates confidence that under the circumstances presented, a debtor is able to obtain a full and fair price for assets sold. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001 Apr. 2, 2001); *In re 388 Route 22 Readington Holdings, LLC*, No. 20-2629, 2021 WL 4811409, at *2 (3d Cir. Oct. 15, 2021) (absent collusion, bankruptcy court properly found well-marketed sale process to be fair and that competitive auction was strong indicator ultimate purchaser paid fair value for debtor's commercial real estate property) (citations omitted).

58.     Prior to the Bid Deadline, Hilco will continue to (a) market the Property and related Assets and solicit other offers consistent with the Bidding Procedures, including, for example, by contacting potentially interested acquirors; (b) provide Acceptable Bidders with data room access and requested materials and information; and (c) otherwise assist the Debtor with all efforts to increase value in a Sale Transaction.  In this way, the Debtor believes the number of bidders eligible to participate in a competitive Auction process will be maximized.  Any proposed sale of Assets therefore will be at a full and fair price.

## 2.   Any Sale will be proposed in good faith and without collusion and any Winning Bidder will be a good faith purchaser entitled to section 363(m) protections.

59.     By the Motion and proposed Sale Order, the Debtor requests that any Winning Bidder emerging from an Auction or otherwise receive the benefits and protections of section 363(m) of the Bankruptcy Code.

60.     Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of … such authorization to an entity that purchased or leased such property in good faith, whether or not such

> entity knew of the pendency of the appeal, unless such
> authorization and such sale or lease were stayed pending
> appeal.

11 U.S.C. § 363(m).

61.     So long as an entity, in "good faith", purchased assets pursuant to section 363 of the Bankruptcy Code, section 363(m) protects that entity from the risk it will lose its interest in the purchased assets if the sale order is reversed on appeal.   While the Bankruptcy Code does not define "good faith," courts have held a purchaser shows its good faith through the integrity of its conduct during the course of the sale process and proceedings; where there is a lack of such integrity, a good-faith finding may not be made.   *See, e.g.*, *Abbotts Dairies,* 788 F.2d at 147 ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.").

62.     Any Winning Bidder emerging from the Auction or otherwise will be a good faith purchaser and therefore should be entitled to receive the full protections of Bankruptcy Code section 363(m).

### 3.   Credit bidding should be authorized under Bankruptcy Code section 363(k).

63.     The Bankruptcy Code permits a secured creditor to "credit bid" the amount of its claim in a sale of its collateral.  Section 363(k) provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k).

64.     Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, that creditor is allowed under section 363(k) of the Bankruptcy Code to bid the total face amount of its claim; a credit bid is not limited to the claim's economic

value. *See In re Submicron Sys. Corp.*, 432 F.3d 448, 459-60 (3d Cir. 2006) (explaining "[i]t is well settled …. that creditors can bid the full face value of their secured claims under section 363(k)").

65.     Absent demonstrated cause for restriction of credit bidding rights, this Court consistently recognizes and enforces a secured creditor's right to credit bid under section 363(k).

66.     Here, the Debtor is aware of no cause for restriction of credit bid rights, including with respect to Keystone.  Keystone in its discretion should be entitled to exercise its credit bid rights in connection with a sale of the Assets.[18]

**C.     The Assets Can Be Sold Free and Clear of All Adverse Interests Pursuant to § 363(f).**

67.     Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in that property if:

> (1)  applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)  such entity consents;
>
> (3)  such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;
>
> (4)  such interest is in bona fide dispute; or
>
> (5)  such entity could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.

11 U.S.C. §363(f).

68.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements is sufficient to permit a sale of the Assets free and clear of all interests that may be asserted in those Assets (i.e. all liens, claims, rights, interests, leaseholds, pledges, obligations (contractual or otherwise), restrictions, limitations, charges, costs,

---

[18]  *See also* Final Financing Order at ¶¶D; E; H; 3; 5-9; 12-14; 17; DIP Term Sheet at 3-4, 7-8.  The Debtor also notes the Challenge Period has expired with no party having sought to file and prosecute a challenge to Keystone's now-allowed secured claims. (*See* Final Financing Order at ¶¶5(a), 5(b).)

debts, restrictions, or other encumbrances, of whatever kind or nature; collectively, "Liens" or

"Adverse Interests"), except with respect to any Adverse Interests that may constitute an assumed

liability or permitted encumbrance under any proposed purchase agreement. *See In re Kellstrom*

*Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the

debtor has the authority to conduct the sale free and clear of all liens."); s*ee also In re Southland*

*Royalty Co. LLC*, 623 B.R. 64, 97 (Bankr. D. Del. 2020) (section 363(f) phrase "any interest in

such property" is applied broadly and "refer[s] to 'obligations that are connected to, or arise from,

the property being sold.'") (citing *In re Trans World Airlines, Inc.*, 322 F.3d 283, 289 (3d Cir.

2003), which was quoting *Folger Adam Sec., Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 259

(3d Cir. 2000)).[19]

69.    The Debtor filed its schedules of assets and liabilities on December 15, 2023. [Dkt.

No. 27.]  Those Schedules listed Keystone as a secured creditor.  Moreover, Multnomah County

has filed a proof of claim asserting a secured claim and statutory lien for unpaid real estate taxes

and related penalties and interest.  The Debtor does not believe there are any other secured claims

asserted against the Property.

70.    The Debtor respectfully submits at least one of the section 363(f) requirements is

met here as to all creditors asserting Liens.  That would include Eastgate should it seek to argue

the Property only can be sold subject to its asserted rights, claims, or interests, including any

claimed rights under the Eastgate Contract or Bankruptcy Code section 365(h).

71.    First, Eastgate must (but cannot) show it actually has interests in property subject

to the proposed sale.  At bottom, Eastgate lacks any rights or interests in the Assets, including the

---

[19]  The *Southland* court found Wyoming real property assets could be sold free and clear under sections
363(f)(1) and (f)(5), notwithstanding arguments any sale needed to be subject to purported real property
covenants running with the land by virtue of contract counterparty's extensive gas gathering systems
located on property and its related agreements with debtor.

Property.

72.     Rather, Eastgate negotiated leasehold rights in a movie theatre that was never constructed (construction never even began).  No "lease term" under the Eastgate Contract ever commenced.  Eastgate never occupied, took possession, or otherwise operated in business from the Property and Eastgate has paid no rent or other amounts to the Debtor (or Receiver) under the terms of the Eastgate Contract or otherwise.

73.     In short, Eastgate has never been an actual tenant of the Debtor and has never held any leasehold interest or "possessory interest" in the Property (the asset the Debtor seeks to sell). Because Eastgate has no interests in the property up for sale, it cannot argue the Debtor fails to meet section 363(f) with respect to that property.

74.     Second, and *assuming arguendo* the Eastgate Contract was in fact executory as of the Petition Date, the Debtor submits that under the Bankruptcy Code and the facts and circumstances presented, the Eastgate Contract was best characterized as an executory contract (rather than an unexpired lease of real property) entered into as part and parcel of the 2017 settlement of the prior Eastgate litigation.[20]

75.     While it may have been possible for the Eastgate Contract to have become an "unexpired lease" if certain events had occurred, those events indisputably did not occur.  The Eastgate Contract never morphed into what would be considered an unexpired lease of real property for Bankruptcy Code purposes.  *See e.g. Sproul v. Gilbert*, 226 Or. 392, 402-08, 413, 419-20 (1961) (determining whether lease or license was created in context of animals grazing on lands owned by federal government; mere description of instrument as lease does not conclusively establish leasehold interest; in determining proper characterization of interest at issue, court

---

[20]  *See e.g.* Rejection Motion at ¶¶44-46.

construes entirety of language used by parties; leasehold interest requires that lessee be granted at least significant or substantial rights of possession and use of property at issue, to the exclusion of others including lessor; also look to character of duties imposed on lessee in respect of maintaining property during period covered; interest found to constitute a lease); *In re Harris Pine Mills*, 862 F.2d 217, 220-21 (9th Cir. 1988) (applying Oregon law; logging agreements at issue did not constitute nonresidential real property leases subject to assumption or rejection provisions of Bankruptcy Code section 365(d)(4); discussing principles used in *Sproul* to determine whether sufficient possessory interest was shown by non-debtor counterparties to create leasehold).

76.    Because the rejected Eastgate Contract did not constitute an "unexpired lease of real property", section 365(h)(1) is inapplicable by its plain terms.[21]  Eastgate therefore cannot rely upon Bankruptcy Code section 365(h) or any similar nonbankruptcy law to argue the Property cannot be sold free and clear of any of its asserted "interests".   The Debtor submits it is clear Eastgate wholly lacks any such interests.

77.    Third, and at bare minimum, the contents of this Motion and the Rejection Motion show any Eastgate-claimed "interests" are in bona fide dispute and therefore under Bankruptcy Code section 363(f)(4), the Property can be sold "free and clear" of any such interests. *See e.g. Southland Royalty Co.*, 623 B.R. at 99 (noting section 363(f)(4) permits free and clear sale if there is "objective factual or legal dispute as to the validity of the interests") (citations omitted).

78.    Fourth, assuming *arguendo* the Eastgate Contract properly is accorded status as a rejected lease of real property, the Property and related Assets still can be sold free and clear of

---

[21] Section 365(h)(1) provides as follows: "(A) If the trustee rejects an unexpired lease of real property under which the debtor is the lessor and — (i)…. or (ii) if the term of such lease has commenced, the lessee may retain its rights under such lease (including rights such as those relating to the amount and timing of payment of rent and other amounts payable by the lessee and any right of use, possession, quiet enjoyment, subletting, assignment, or hypothecation) that are in or appurtenant to the real property for the balance of the term of such lease…to the extent that such rights are enforceable under applicable non-bankruptcy law."

any claims and interests asserted by Eastgate.

79.    Just because a contract constitutes an unexpired lease of real property for Bankruptcy Code purposes does not mean the contract counterparty automatically has section 365(h) rights to assert.  The requirements of section 365(h)(1) must be met first (and they are not met here).  *See e.g. In re Marina Enterp., Inc.*, 14 B.R. 327, 333-34 (Bankr. S.D. Fla. 1981) (debtor permitted to reject lease that required it to build Atlantic City hotel and casino property for contract counterparty (construction never even began); court found no section 365(h) rights for that counterparty where lease term never commenced and counterparty had neither paid rent nor used or possessed subject property).

80.    And even if a party has section 365(h)(1) rights to assert, that does not mean they can block a section 363(f) free and clear sale of assets.[22]  S*ee e.g. In re Royal Alice Props., LLC*, 637 B.R. 465 (Bankr. E.D. LA. 2021) (approving trustee settlement with secured lender and relying on §§363(f)(1) and (f)(4) to authorize sale of estate properties in connection therewith, free and clear of true leases held by insiders; discussing sections 363(f) and 365(h) but finding §365(h) not implicated because leases had not been rejected); *Matter of Spanish Peaks Holdings II, LLC*, 872 F.3d 892, 898-900 (9th Cir. 2017) (authorizing sale of Montana property free and clear of rights under then-unexpired leases; harmonizing sections 363(f) and 365(h)(1)).

81.    Fifth, because under Oregon law the Property could be sold free and clear of any claimed interests of Eastgate (leasehold or otherwise), section 363(f)(1) is met as to any claims and interests asserted by Eastgate.[23]

---

[22] Even if the Eastgate Contract somehow is deemed to have been an unexpired lease of real property prior to rejection, application of the plain language of section 365(h)(1)(A)(ii) to the actual facts and circumstances presented here makes clear Eastgate has no cognizable section 365(h) rights to protect and assert in opposition to a proposed free and clear sale of the Property.  Any leasehold rights of Eastgate would have been in a theatre that does not exist and obviously is not being sold.

[23] The parties chose Oregon law to govern.  (Eastgate Contract, §24.8.)

82.     The Receiver was appointed, in large part, to take control of and ultimately sell the Property.  The Property served as the principal collateral for the Keystone Loan.[24]

83.     In the Receivership Proceedings, the Receiver promptly sought to reject the Eastgate Contract and then market and sell the Property free and clear of any encumbrance thereon.[25]  Eastgate objected to and delayed all of the Receiver's efforts through the summer of 2022 and then, on the day prior to the hearing scheduled on the Receiver's rejection request, Eastgate filed bankruptcy.

84.     The Oregon Receivership Code would have permitted the Receiver to reject the Eastgate Contract and then effectuate a subsequent free and clear sale of the Property.[26]  That primarily is because Eastgate, at most a nonpriority general unsecured creditor, was never a tenant in possession and thus had no tenant obligations to continue to perform under the Eastgate Contract (no tenant obligations kicked in because theatre was never built).  The Oregon Receivership Code, including ORS section 37.240(7)(a)(B), therefore by its plain terms would have been of no ultimate help to Eastgate in any efforts to block a Receiver free and clear sale under Oregon law.

85.     Sixth, the absence of an objection to the relief sought in this Motion is or should be

---

[24] *See* Receivership Order (Exhibit 8 attached to Rejection Motion), ¶¶3 (findings), 4(A) (conclusions), 4(G)(7), 4(G)(10), 4(G)(19).

[25] *See* Rejection Motion at ¶¶30-38, 46-47, 51 (discussing Receiver filings made in (a) Receivership Proceedings (including Receiver's Response to the Eastgate Opposition) and (b) Regal Cinema bankruptcy cases (Receiver's Motion to Compel Rejection)).

[26] *See e.g.* Oregon Receivership Code (ORS 37.110(1) (powers of receiver include sale of estate property); 37.240(1) (right of receiver to reject executory contracts); 37.240(7)(a)(B) (receiver can reject lease of real property where debtor is owner/lessor, but tenant can "remain in possession and continue to perform all obligations arising under the contract", subject to offset for tenant damages caused by rejection); 37.240(7)(b) (confirming receiver can sell real property); 37.250(2) (authorizing sale of estate property free and clear of liens of party who obtained appointment of receiver and any subordinate liens and redemption rights, but sale would be subject to senior liens); 37.250(3) (liens extinguished by transfer of estate property attach to sale proceeds with "same validity, perfection, and priority" existing immediately prior to transfer); 37.030 (definitions, including "lien" at 37.030(10))); *see also* ORS §312.70 (county acquiring real property by foreclosure for delinquent taxes, free from all liens and encumbrances except municipal assessments); ORS §§35.205 et seq. (Oregon condemnation laws).

deemed consent within the meaning of section 363(f)(2) of the Bankruptcy Code. *See Hargrave v. Township of Pemberton* (*In re Tabone, Inc.*), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, secured creditor deemed to consent under section 363(f)(2) of the Bankruptcy Code); *In re Boy Scouts of Am.*, 642 BR 504, 569 (Bankr. D. Del. 2022) ("The lack of objection of a [creditor] is also consensual for purposes of § 363 and, again, permissible under § 363(f)(2).")

86.     And finally, as to any properly claimed interests in the Assets not addressed under one of the §363(f)(1)-(4) requirements, the Assets may be sold free and clear of any such interests under section 363(f)(5) because the entity claiming any such interests[27] could be compelled in a legal or equitable proceeding to accept a money satisfaction of such interest. *See e.g. In re MMH Automotive Group, LLC*, 385 B.R. 347, 371-72 (Bankr. S.D. Fla. 2008, as amended, March 18, 2008) (billboard lessee did not receive notice of prior bankruptcy "free and clear" sale of underlying real property; when dispute with purchaser arose several months later, court ultimately found section 363(f)(5) would have been satisfied and prior sale was free and clear as to the interests of billboard lessee who could have been compelled to accept money satisfaction of its interests, per specific lease provisions).

87.     The Debtor respectfully submits that one or more of the section 363(f) requirements are satisfied as to all creditors and parties in interest, including Eastgate. Moreover, and as occurs in many other cases involving section 363 sales of property, any actual lienholders and other creditors asserting valid interests in the property sold will be adequately protected by having their liens or interests, if any, attach to net sale proceeds with the same validity, extent, and priority that

---

[27] Including Eastgate, assuming it even has any cognizable interests in the Assets to begin with (it does not). *See also* Eastgate Contract, §3.5.6 (addressing liquidated damages in event of termination due to Theatre not being delivered by Final Delivery Deadline (10/1/20)); §22.1 (addressing parties' rights and obligations in event of condemnation of Theatre or portion of Center material to Theatre operation).

such liens or interests enjoyed immediately prior to a sale, subject to any rights, challenges, objections, claims, and defenses possessed by the Debtor or bankruptcy estate. A "free and clear" sale will enable the Debtor to maximize the value of the Assets, for the benefit of the estate. Accordingly, the Debtor requests that any sale of the Assets be free and clear of all Adverse Interests, of whatever nature or character, unless otherwise specified in the subject purchase agreement.

**D**.    **Prompt and Sufficient Notice of the Sale Will Be Provided**.

91.    Notice of this Motion will be provided as indicated below. And, the Auction and Sale Notice will be served in a manner that provides creditors and parties in interest notice of (a) the date, time, and location of the Auction and Sale Hearing; (b) the Assets to be sold (primarily the Property); (c) the deadlines for objecting to the proposed Sale; and (d) other information and deadlines relevant to the proposed Sale. The form and manner of the Auction and Sale Notice will have been approved by entry of the Bidding Procedures Order before it is served on creditors and parties in interest.

**E. Waiver of Bankruptcy Rule 6004(h).**

92.    Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property … is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). The Debtor requests that any Sale Order contain a provision waiving the 14-day stay provided under Bankruptcy Rule 6004(h).

93.    The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before implementation of an order. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the stay period, Collier suggests the 14-day stay period should be eliminated to allow a sale or other transaction to

close immediately "where there has been no objection to the procedure." 10 Lawrence P. King, Collier on Bankruptcy, ¶ 6004.10 (16th ed. 2010). Collier further provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to seek a stay, unless the court determines the need to proceed sooner outweighs the interests of the objecting party. *Id.*

94.     The Debtor seeks to preserve and maximize the value of the Property and any related Assets by proceeding to a Closing as soon as possible following entry of a Sale Order. Confirmation that any Sale Order will be final and enforceable upon entry will help further those efforts. Accordingly, the Debtor hereby requests waiver of any applicable 14-day stay period under Bankruptcy Rule 6004(h) or otherwise.

## RESERVATION OF RIGHTS

95.     Nothing contained herein is intended to or shall be construed as: (i) an admission or concession of any kind, including as to the validity, amount, or priority of any claim against the Debtor; (ii) a waiver of the Debtor's rights to dispute any filed claim, on any applicable grounds; (iii) a promise or requirement to pay any claim, in whole or in part; (iv) a waiver of any rights, claims, defenses, or causes of action of the Debtor as against any person or entity; or (v) a waiver or limitation of the Debtor's rights under the Bankruptcy Code, any other applicable law, or any agreement.

## NO PRIOR REQUEST

96.     No prior request for the relief sought in this Motion has been made to this Court or any other court.

## NOTICE

97.     Notice of this Motion will be provided to the following parties or their respective and known counsel: (i) the Office of the U.S. Trustee for the District of Delaware; (ii) counsel for

Eastgate Theatre, Inc. and New RCI Holdings, Inc.; (iii) counsel for Keystone; (iv) counsel for the

Receiver; (v) Multnomah County (Portland, Oregon); (vi) the Internal Revenue Service; (vii) the

offices of the attorneys general for Oregon, Texas, and Delaware; (viii) the U.S. Department of

Justice; (ix)  the Debtor's largest unsecured creditors, as identified in its chapter 11 petition; and

(x) all other parties requesting notice pursuant to Bankruptcy Rule 2002.  In light of the nature of

the relief requested herein, the Debtor submits no other or further notice is necessary or required.

WHEREFORE, for the reasons set forth above, the Debtor respectfully requests (i) entry

of the Bidding Procedures Order in substantially the form attached hereto as Exhibit A, (ii) entry

of a Sale Order following a Sale Hearing to be scheduled by the Court, and (iii) such other and

further relief as is deemed just and proper.

Dated: February 27, 2024

**ASHBY & GEDDES, P.A.**

*/s/ Gregory A. Taylor*
Gregory A. Taylor (No. 4008)
Michael D. DeBaecke (No. 3186)
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801
Phone: (302) 654-1888
Email: GTaylor@ashbygeddes.com
          MDeBaecke@ashbygeddes.com

*Counsel for Debtor*